UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

RODNEY KILGORE & )
WILLIAM KILGORE )
)
Plaintiffs, )
) Case No. 1:16-cv-340
v. )
) Judge Mattice
JOHNNY HUNTER, ) Magistrate Judge Steger
DANIEL RUSKEY, & )
JOHNNY MCBEE, )
)
Defendants. )
)

## ORDER

This matter is before the Court on the Motion to Compel Mediation (Doc. 94), Motion for Partial Summary Judgment/Motion in Limine (Doc. 107), and Motion to Dismiss Without Prejudice (Doc. 158), all filed by Plaintiffs Rodney Kilgore and William Kilgore, as well as the Motion for Summary Judgment (Doc. 110) filed by Defendants Johnny Hunter, Daniel Ruskey, and Johnny McBee. The Court, having carefully considered the parties' submissions, the entire record, and the applicable law, finds as follows: (1) that the Motion to Compel Mediation, Motion for Partial Summary Judgment/Motion in Limine (Doc. 107), and Motion to Dismiss Without Prejudice (Doc. 189) should be **DENIED**; (2) that the Motion for Summary Judgment (Doc. 110) should be **GRANTED**; and (3) that this matter should be **DISMISSED** with prejudice.

## I.    BACKGROUND

The story of this lawsuit begins with the story of a different lawsuit. Plaintiffs Rodney Kilgore and William Kilgore both operate wrecker companies that work in conjunction with the Tennessee Highway Patrol ("THP") to tow motor vehicles from the

highway. This arrangement works by wrecker companies applying for placement on the state of Tennessee's "rotation list." Wrecker companies on the list must comply with state and federal law, as well as all provisions of the Tennessee Department of Safety Towing Service Standards Manual. When a vehicle on the highway requires a towing service, THP officers simply call the next name on the rotation list. Rodney Kilgore operates Monteagle Wrecker Service ("MWS") and William Kilgore operates Sonny's Wrecker Service ("Sonny's").[1] Both MWS and Sonny's are on the state rotation list. For a short period of time, Plaintiff Rodney Kilgore had two locations for MWS – one in Kimball, Tennessee, the other in Grundy County, Tennessee.

On January 6, 2016, Plaintiffs filed suit against various THP officers, alleging, *inter alia*, claims of retaliation and denial of equal protection under law in regard to their companies' temporary removals from the state rotation list in 2013. This suit was styled *Adair, et al. v. Hunter, et al.*, E.D. Tenn. Civil Case No. 1:16-cv-3.[2] The only common Defendant between the prior suit and this one is Defendant Johnny Hunter, an officer with THP.

In this action, Plaintiffs allege that throughout 2016, Defendant Hunter and other THP officers retaliated against them for filing *Adair v. Hunter*. First, Plaintiffs allege that Defendant Hunter prevented Sonny's from getting a towing job on June 8, 2016. On that day, a tractor trailer was involved in an accident on Interstate 40 and caught fire. According to Plaintiffs, Sonny's was the next name on the rotation list and was called to the scene. Thereafter, William Kilgore was told that the owner of the tractor trailer

---

[1] Because there are two parties with the last name "Kilgore," the Court will refer to Plaintiffs by their full names throughout this Order.

[2] For the sake of clarify and simplicity, the Court will henceforth refer to Plaintiffs' prior lawsuit as "*Adair v. Hunter.*"

requested a different towing service, and Sonny's was "called-off." Plaintiffs state that Defendant Hunter was in charge at the scene, and acted improperly to ensure Sonny's did not complete the job. (Doc. 1 at 5-7).

Next, Plaintiffs allege that two THP officers, Defendants Daniel Ruskey and Johnny McBee, retaliated against them in July 2016.[3] In March 2016, MWS towed the vehicle of Shasta Gearhart, after a breakdown on the Interstate. A THP officer on the scene called the next service on the rotation list, which was MWS. Rodney Kilgore personally drove the wrecker and towed Gearhart's vehicle. Gearhart was unsatisfied with MWS's service because, among other things, Kilgore used his phone while he was driving the tow truck. Gearhart was so concerned that she took a video of Kilgore, and then complained to the THP. Daniel Ruskey was the investigating officer, and after reviewing Gearhart's complaint and the evidence, he found that MWS had violated various state and federal statutes regarding cell phone use by commercial drivers, and recommended MWS's suspension from the towing list for thirty days as punishment. Defendant McBee–the acting District Captain–agreed, and issued a notice of violation that was sent to Rodney Kilgore on July 26, 2016.

Rodney Kilgore appealed the suspension, and pursuant to THP policy, a hearing was held on August 23, 2016, before District Captain R.C. Christian. The parties to the hearing consisted of the Tennessee Department of Safety and Homeland Security and MWS. Following the hearing, the violations were overturned, and MWS remained on the state rotation list. Plaintiffs contend that the real motivation behind the suspension was

---

[3] Neither Ruskey nor McBee were named Defendants in *Adair v. Hunter*.

not Gearhart's complaint or Defendants' belief that he violated relevant statutes, but rather retaliation for filing his prior suit.

Finally, Plaintiff Rodney Kilgore generally alleges that Defendant Hunter and his "agents" continually harassed him after January 2016 such that he was forced to close the MWS location in Grundy County, Tennessee.[4] The Court will provide additional factual information in its analysis below.

Plaintiffs filed the instant action on August 18, 2016, alleging First Amendment retaliation claims as well as violations of Plaintiffs' rights to access the courts. On March 2, 2018, Defendants filed their Motion for Summary Judgment (Doc. 110) and Memorandum in Support (Doc. 132), arguing that Plaintiffs have failed to establish a *prima facie* case, and that in any event, they are entitled to qualified immunity. Plaintiffs filed a Response (Docs. 131, 132) on April 3, 2018. Defendants filed a Reply (Doc. 134) on April 4, 2018.

Plaintiffs have also filed several Motions. On January 29, 2018, Plaintiffs filed a Motion to Compel Mediation (Doc. 94). Defendants filed a Response (Doc. 95) the same day, and Plaintiffs filed a Reply (Doc. 96) on February 1, 2018. Plaintiffs also filed a Motion for Partial Summary Judgment/Motion in Limine (Doc. 107) on February 28, 2018. Defendants field their Response (Doc. 113) on March 13, 2018, and Plaintiffs filed a Reply (Doc. 133) on April 3, 2019. Finally, Plaintiffs filed a Motion to Dismiss Without Prejudice (Doc. 158) on June 14, 2018. Defendants submitted a Response (Doc. 159) the same day. No reply was filed.

---

[4] Plaintiffs' Complaint initially included other factual bases for their claims, but these have since been voluntarily dismissed. (Docs. 131, 132).

The Court finds that the issues in this matter have been fully briefed and are ready for disposition.

## II. STANDARD

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving

-5-

party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III.   ANALYSIS

### A.   Defendants' Motion for Summary Judgment (Doc. 110)

#### 1.   First Amendment Retaliation

Plaintiffs contend that Defendants retaliated against them on three distinct occasions in violation of their rights under the First and Fourteenth Amendments. According to Plaintiffs, Defendants engaged in retaliatory conduct due to the lawsuit Plaintiffs filed against various THP officials in January 2016.

In order for Plaintiffs to establish a retaliation claim, they must demonstrate:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

-6-

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (citations omitted). The Court finds that Plaintiffs have established the first element. It is well-settled that filing a lawsuit is activity protected under the First Amendment. *Eckerman v. Tenn. Dep't of Safety, et al.,* 636 F.3d 202, 208 (6th Cir. 2010) ("The filing of a lawsuit to redress grievances is clearly protected activity under the First Amendment."). The Court must analyze the remaining elements in the context of each factual allegation from which Plaintiffs' claims arise, including the burnt tractor trailer incident in June 2016, Rodney Kilgore's suspension from the rotation list in July 2016, and the general harassment of Rodney Kilgore throughout 2016.

a.     *The Burnt Tractor Trailer*

The first retaliatory act alleged by Plaintiffs arises from a tractor trailer crash on Interstate 40 that occurred June 8, 2016. (Doc. 1 at 5). THP initially called Sonny's to the scene, but the parties agree that a delay occurred due to a high volume of traffic from a multi-day music festival nearby. For that reason, THP decided to pull the vehicle to the side of the road until traffic cleared, and then allow Sonny's to tow the crash away within a few days. (Docs. 156 at 3; 177 at 5).

According to Plaintiffs, Defendant Hunter thereafter "took over the scene" and prevented Sonny's from completing the job by "arranging" for a different towing company—Ikard Towing—to intervene. (Doc. 177 at 5-7). William Kilgore alleges he was made to wait for an extended period, and that Defendants Hunter and Ruskey were uncommunicative during this time. He alleges that he was ultimately contacted and told that the owners of the tractor trailer had requested that Ikard Towing haul the wreckage, which he contends was a falsehood. (*Id.* at 5).

Defendants contend that Plaintiffs cannot demonstrate the third element of a retaliation claim; that is, that there is a causal connection between the protected conduct and Defendants' adverse action. To establish causation, Plaintiffs must demonstrate that their protected speech is "a substantial or motivating factor" of the adverse action. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)). This inquiry is "essentially but-for cause." *Id.* (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)). Thus, Plaintiffs must "produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that [the adverse action] would not have occurred but for his engagement in protected activity." *Eckerman,* 636 F.3d at 209. If Plaintiffs meet their initial burden of demonstrating their speech was a "substantial or motivating factor" of the adverse action, the burden shifts to Defendant to show that they would have taken the same action absent the protected conduct. *Id.*

The only evidence Plaintiffs offer in this regard is a circumstantial inference— because Defendant Hunter was involved in working the crash, the only explanation for why Sonny's was "called off" after considerable delay is that Hunter was retaliating against Plaintiffs for filing the *Adair v. Hunter* lawsuit six months before. This will not suffice. During his deposition, William Kilgore testified that had no personal knowledge as to who made the decision that Sonny's be "called off" from the wreck. (Doc. 110-8 at 4-5). He also admitted that he had no evidence that Hunter prevented him from towing that particular vehicle. (*Id.* at 3-4).

Conversely, Defendants present competent summary judgment evidence demonstrating that Defendant Hunter did not act in retaliation towards Plaintiffs. Specifically, Defendants offer the sworn deposition testimony of Jason Ikard, the

proprietor of Ikard Towing. (Doc. 110-9). Ikard testified that he independently discovered the June 2016 crash via Facebook post, noted the United States Department of Transportation Number ("DOT number") on the vehicle, and worked with an employee to discover the owner of the tractor trailer. (*Id.* at 2-3). Thereafter, he contacted the owner and offered Ikard Towing services, which the owner later accepted. (*Id.* at 3).

In response, Plaintiffs argue that Ikard's actions were in violation of the towing manual, and thus, his actions in securing the towing job cannot be legitimate. (Doc. 177 at 7). Plaintiffs cite to a portion of the THP Towing Manual forbidding towing services from "chasing" crashes. Another provision prohibits towing companies on the rotation list from soliciting business while on the scene of a crash. The manual also states that a towing company currently on the list will be investigated if it shows up at the scene of a crash without a call from THP. (Docs. 110-2 at 24; 177 at 4-5). Upon review, none of these provisions are pertinent to the circumstances of this case. First, there is no allegation that Ikard Towing "chased down" the crash. The evidence reflects that Ikard Towing independently discovered the crash, contacted the owners, and secured their permission to tow the wreckage. Second, the remainder of the provisions Plaintiffs cite are inapplicable to Ikard Towing because the company is not on the THP rotation list. Thus, this argument is without merit.

Plaintiffs also attempt to cast doubt on Jason Ikard's ability to identify the owner of tractor trailer from a Facebook post and describe his testimony as "suspicious." (Doc. 177 at 6). Plaintiffs allege that Ikard could not have discovered the vehicle's VIN number or any other identifying information due to the damage suffered in the crash. The Court first notes that Ikard did not testify that he could see the VIN number, which is normally

located in a discrete location, from a photograph.[5] Rather, Ikard definitively testified that he was able to spot the vehicle's DOT number, a completely separate identifier. (Doc. 110-9 at 2). Plaintiffs offer no evidence or particular arguments showing that Ikard's ability to detect this information from a photograph is an impossible (or even difficult) feat. In addition, Plaintiffs offer no competent evidence as to the severity of the crash that would serve to obscure the DOT number. Said another way, they contend that Ikard's story does not "hold water" without any particular explanation why or evidence in support. (Doc. 177 at 7).

Finally, William Kilgore's argument that Defendants' delay in action constitutes evidence of retaliatory motive is belied by his own deposition testimony. William Kilgore testified that there was nothing wrong with THP allowing heavy traffic to pass before allowing a towing company to haul off the wreckage. (Doc. 110-8 at 4). He further testified that the resulting delay was not improper. (Id.).

While this Court must view the facts in the light most favorable to the nonmovant, this duty "does not require or permit the court to accept as true mere allegations that are not supported by factual evidence." *Rodriguez v. City of Cleveland*, 439 Fed. Appx 433, 456 (6th Cir. 2011) (citations and quotations omitted). In addition,

> to withstand a properly supported motion for summary judgment, plaintiff must do more than rely merely on the allegations of h[is] pleadings or identify a "metaphysical doubt" or hypothetical "plausibility" based on a lack of evidence; []he is obliged to come forward with "specific facts," based on "discovery and disclosure materials on file, and any affidavits," showing that there is a genuine dispute for trial.

---

[5] Defendants also refer to the vehicle's VIN number in their brief, but Ikard's deposition clearly states that he located the DOT number on the Facebook photo. (Doc. 111 at 4).

*Id.* (quotations and citations omitted); *see also* Fed. R. Civ. Pro. 56(c). At best, Plaintiffs in this case have identified a "metaphysical doubt" or "hypothetical plausibility" as to the sufficiency of the evidence presented by Defendants. According to Sixth Circuit precedent, this is insufficient to create a genuine dispute of material fact. Therefore, the Court finds that Defendants' Motion for Summary Judgment should be **GRANTED** in this respect and Plaintiffs' claim **DISMISSED**.

### b. *Rodney Kilgore Suspension*

Plaintiffs next contend that MWS's suspension from the rotation list in July 2016 by Defendants Ruskey and McBee constitutes a retaliatory action. As outlined above, MWS completed a towing job for Shasta Gearhart and others in March 2016, after Gearhart's car broke down on Interstate 24. (Doc. 110-3). The record indicates that THP dispatched MWS to the scene. (Docs. 108-1 at 1; 110-3). According to communications between Gearhart and the THP, Gearhart was initially concerned because she and the other passengers remained in the car after it was placed onto the tow truck, even after the tow truck continued onto the interstate. (*Id.* at 1). Gearhart then noticed that Rodney Kilgore, who was operating the tow truck, was "checking his phone while driving." (*Id.*). One of Gearhart's passengers took a nine-second video that depicts Kilgore holding his phone and looking down at it while driving the tow truck down the highway. (Doc. 110-4). Thereafter, Gearhart filed a complaint against MWS with the THP, alleging that the tow was unsafe and that Kilgore refused to give her a refund when she complained. (Doc. 110-3).

Following the receipt of Gearhart's complaint, Defendant Ruskey investigated the allegations against Kilgore and concluded that he had violated the following statutes: (1) 49 C.F.R. § 392.82 , forbidding commercial motor vehicle drivers from using a hand-held

mobile device while driving; (2) 49 C.F.R. § 392.8, forbidding commercial vehicle drivers from texting while driving; (3) Tenn. Code Ann. § 55-8-199, forbidding the use of hand-held mobile telephone by any driver to transmit or read a written message; and (4) Tenn. Code Ann. § 55-8-136, requiring that drivers exercise due care. (Doc. 108-1 at 2-3). Based on these perceived violations, Defendant Ruskey recommended to Defendant McBee that MWS be suspended from the rotation list for a period of thirty days. Defendant McBee agreed, and issued a letter to Rodney Kilgore on July 26, 2016, explaining the violations and resulting punishment. (Doc. 108-1).

Rodney Kilgore appealed the suspension. A hearing took place before THP District Captain R.C. Christian on August 23, 2016. (Doc. 108-3). Rodney Kilgore was present and represented by counsel. Defendants Ruskey and McBee were also present. During the hearing, Captain Christian watched the video submitted by Gearhart and questioned Rodney Kilgore on several matters. (*Id.*). Christian also asked a handful of questions between Ruskey and McBee. (*Id.*).

Thereafter, Captain Christian issued a final written determination, which was sent to Rodney Kilgore. (Doc. 108-2). In regard to the violations of federal code, Christian wrote that "Lieutenant Ruskey has definitely raised a valid point," but that upon further research in the regulation guidance, he found the federal codes only applied if the transportation at issue was "interstate in nature." Because Kilgore was towing Gearhart's car within the state of Tennessee, Christian found that neither federal code cited by Defendant Ruskey applied to Kilgore's conduct. (*Id.*). In regard to the state statutes, Christian noted that it was impossible to tell from the nine-second video Gearhart submitted whether Kilgore was actually sending or receiving a "written message" as proscribed by the statute. Christian wrote that notwithstanding his "firm convictions

regarding the issue of distracted driving," the evidence did not reflect that Kilgore violated the pertinent statutes. (*Id.*). Thus, the suspension implemented by Defendants Ruskey and McBee was overturned, and MWS remained on the THP rotation list.

The parties do not dispute that removal from the state towing list constitutes an adverse action for purposes of a First Amendment retaliation claim. *Lucas v. Monroe County*, 203 F.3d 964, 973 (6th Cir. 2000). The point of disagreement as to this claim is Plaintiffs' ability to establish causation. As outlined above, to satisfy this element, Plaintiffs must demonstrate that their protected speech is "a substantial or motivating factor" of the adverse action. *Vereecke*, 609 F.3d at 400. This inquiry is "essentially but-for cause." *Id.* Therefore, Plaintiffs must "produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that [the adverse action] would not have occurred but for his engagement in protected activity." *Eckerman,* 636 F.3d at 209. If Plaintiffs meet their initial burden of demonstrating their speech was a "substantial or motivating factor" of the adverse action, the burden shifts to Defendant to show that they would have taken the same action absent the protected conduct. *Id.*

According to Plaintiffs, they have sufficiently established this requirement because (1) the removal took place seven months after *Adair v. Hunter* was filed; and (2) the violations cited by Defendants Ruskey and McBee were ultimately overturned on appeal. Conversely, Defendants contend that their actions regarding the suspension were legitimate and reasonable based on Gearhart's complaint. Plaintiffs attack this argument by insisting the Court cannot consider the legitimacy of Defendants' investigation or findings pursuant to the doctrine of collateral estoppel, based on Captain Christian's determination that MWS did not violate the federal or state statutes.

The Court will first examine whether collateral estoppel applies in this case. "Federal courts must apply state collateral estoppel law when determining whether a state court's judicial determination has preclusive effect in a particular § 1983 action." *Burda Bros., Inc. v. Walsh,* 22 Fed.Appx. 423, 429–30 (6th Cir.2001).[6] Therefore, the Court will look to Tennessee law in this regard. As stated by the Tennessee Supreme Court, collateral estoppel "bars the same parties or their privies from relitigating in a later proceeding legal or factual issues that were actually raised and necessarily decided in an earlier proceeding." *Mullins v. State*, 294 S. W. 3d 529, 534-35 (Tenn. 2009) (citations omitted). The party invoking collateral estoppel has the burden of proof. *Id.* (citations omitted). In order prevail on their collateral estoppel argument, Plaintiffs must establish the following elements:

> (1) that the issue to be precluded is identical to an issue decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded.

---

[6] The Court will assume without deciding that the THP hearing constitutes a state court "judicial determination." Claim and issue preclusion apply "in an administrative law context following a trial type hearing." *Drummond v. Comm'r of Soc. Sec.,* 126 F.3d 837, 841 (6th Cir.1997) (quoting 2 *Kenneth Culp Davis & Richard J. Pierce, Jr., Admin. Law Treatise* § 13.3 (3d ed.1994)); *see also Univ. of Tenn. v. Elliott,* 478 U.S. 788, 796–99, (1986) ("[W]hen a state agency 'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the State's courts.") (citations omitted); Restatement (Second) of Judgments § 27. Usually, these administrative decisions are issued by an administrative law judge. *See Eckerman*, 636 F.3d at 206-07; *Miller v. Detroit Pub. Sch.*, 189 F. Supp. 3d 671, 676 (E.D. Mich. 2016).

In this case, the relevant decision issued from a THP District Captain. While there was a hearing, the state of Tennessee was not formally represented at the hearing, and the proceeding was decidedly casual in nature. On the record currently before the Court, the hearing does not readily resemble a "trial type" proceeding. Nonetheless, and because the Court finds that Plaintiffs' collateral estoppel argument fails on other grounds, it will not engage in a lengthy analysis that the parties failed to brief and which is considerably unclear from the record.

*Id.* at 535.

Although the parties offer numerous arguments on this topic, the Court finds that the pivotal issue here is whether Defendants Ruskey and McBee are in privity with the Tennessee Department of Safety and Homeland Security, the opposing party in the THP appeal, for purposes of collateral estoppel.[7] In this context, privity "relates to the subject matter of the litigation, not to the relationship between the parties themselves." *State ex rel. Cihlar v.* Crawford, 39 S.W.3d 172, 180 (Tenn. Ct. App. 2000) (internal citations omitted); *see also Trinity Indus., Inc. v. McKinnon Bridge Co.,* 77 S.W.3d 159, 185 (Tenn. Ct. App.2001) ("[D]ifferent parties are in privity if they stand in the same relationship to the subject matter of the litigation."). "Privity connotes an identity of interest, that is, a mutual or successive interest to the same rights." *Crawford,* 39 S.W.3d at 180 (internal citations omitted).

A brief review of Sixth Circuit precedent is helpful to the Court's analysis. The Sixth Circuit has repeatedly held that a § 1983 plaintiff may not use collateral estoppel offensively against a defendant officer because the officer was not a party to or in privity with a party to the earlier action. *Burda Brothers, Inc. v. Walsh*, 22 Fed. App. 423, 430 (6th Cir. Oct. 12, 2001) (unpublished); *Kegler v. City of Lovonia*, 173 F.3d 429 6th Cir. Feb. 23, 1999) (table opinion); *Wallace v. Mamula*, 30 F.3d 135 (6th Cir. Jul. 26, 1994) (unpublished). All of these actions involved suits from private citizens alleging wrongful conduct of defendant police officers, such as a search or seizure unsupported by probable cause. On the other hand, in *Eckerman*, the Sixth Circuit held that preclusion applied. In

---

[7] The relevant documents clearly indicate that individual Defendants were not named parties in Kilgore's appeal of MWS's suspension. The style of the action was "*State of Tennessee Department of Safety and Homeland Security vs. Monteagle Wrecker Service of Kimball*," and the style of the appeal was "*In Re: Rodney Kilgore.*" (Docs. 108-1; 108-3).

that case, a state trooper brought a § 1983 retaliation action against the THP and THP officials involved in a decision to demote him on the basis of his political beliefs. 636 F.3d at 204. The trial court granted summary judgment, finding that the real reason for the trooper's demotion was his violations of various THP rules. The Sixth Circuit reversed, holding defendants were bound by a state administrative law judge's decision that the employee had not violated any rules and that his demotion was improper. *Id.* at 205.

In this case, Defendants were not parties to the THP hearing, and the Court further finds that they were not in privity with the state of Tennessee. As stated above, privity "relates to the subject matter of the litigation, not to the relationship between the parties themselves." *Crawford,* 39 S.W.3d at 18. While Defendants are employees of the state, their relationship with this litigation is simply not the same as that of the state in the prior proceeding. In the THP hearing, the state's interest was simply to defend its decision that Rodney Kilgore violated state and federal statutes. The state was not faced with the prospect of civil liability or the accusation that the violations were based on retaliatory animus, which are the possibilities confronted by the Defendants in this matter. While not identical to the circumstances presented in *Burda*, *Kegler*, or *Wallace*, the controlling principle in those cases—that the state and its employees are different entities with separate interests—nonetheless applies in the instant action.

Another example brings this concept into further clarity. In *Miller v. Detroit Public Schools*, plaintiff argued individual officials with a public school district were estopped from denying that they took adverse actions against her when an ALJ had already concluded in state proceeding that the public school district itself had discriminated against her. 189 F. Supp. 3d 671, 682 (E.D. Mich. 2016). The trial court held that the interests of the individual defendants were "presented and protected by" the school

district in the administrative proceeding, because liability for retaliation was the possible result in both hearings. *Id.* In this case, Defendants' interests were not "presented and protected by" the state of Tennessee, given the disparate nature of the outcomes of the two cases.

Plaintiffs insist that this Court should follow the Sixth Circuit's ruling in *Eckerman*. The Court, however, finds that this case is distinguishable from *Eckerman* in several different respects. First, the Sixth Circuit did not consider the issue of privity in its analysis. The issue of preclusion was raised *sua sponte*, and the court even admonished the parties for their failure to brief the question: "We fault the parties for not making the significance of [the prior] proceeding and its findings of fact clear to the district court. The parties also neglected to research and inform this Court of the legal implications of the proceedings before [the ALJ]." 636 F.3d at 210 n. 6. Here, the parties offer detailed and extensive arguments regarding privity, which the Court must address in order to resolve this dispute. In addition, the defendants in *Eckerman* based their entire argument at summary judgment on the fact that plaintiff actually violated the department rules. *Id.* at 209. In this case, Defendants are not arguing that Rodney Kilgore actually violated the relevant statutes—they are arguing their belief that Kilgore violated the statutes was reasonable under the circumstances and was not motivated by retaliatory animus. This is perhaps a subtle but important distinction. Finally, the plaintiff in *Eckerman* had separate, considerable evidence of causation to establish his *prima facie* case. This evidence included job assignments that were below his skill level and experience and derogatory references by defendants aimed at plaintiff. Here, as will be set forth more fully below, Plaintiffs offer no other evidence of causation. For these reasons, the Court declines to follow the Sixth Circuit's ruling in *Eckerman*.

-17-

Accordingly, the Court finds that Plaintiffs have failed to carry their burden of showing that collateral estoppel applies. Because preclusion principles do not apply, the Court may delve into the legitimacy of Defendants' explanation and supporting evidence for MWS's removal from the rotation list.

As explained *supra*, Defendants' actions took place following Gearhart's complaint against MWS. There is no evidence that Defendants prompted or encouraged the complaint, or that they exploited the opportunity in order to exact revenge upon Kilgore for filing *Adair v. Hunter*. In his deposition, Rodney Kilgore testified that he believed that Gearhart's complaint was a set-up or conspiracy, but he offers nothing beyond his subjective belief of this fact. (Doc. 110-7 at 12-13). Moreover, the record reflects that Defendant Ruskey affirmatively declined to act on the entirety of Gearhart's complaints. For example, Gearhart stated in her e-mail to THP that she was unhappy that she and the other passengers remained in the vehicle while it was towed. (Doc. 110-3). At the THP hearing, Defendant Ruskey explained that this practice did not violate Tennessee law or THP policy, and that he conveyed to Gearhart that the conduct was not actionable. (Doc. 108-3 at 9). Likewise, the notice of violation sent to Kilgore does not mention Gearhart's concerns in this respect. (Doc. 108-1). This fact does not indicate retaliatory animus.

Further, District Captain Christian's determination fails to reflect that Defendants acted with an invalid motive. The determination clearly stated that Defendant Ruskey "had a valid point" and that the Captain Christian himself held reservations about the "distracted driving" evidenced by the record. (Doc. 108-2). Moreover, the reasoning behind Christian's decision to overturn the federal violations was not based on blatant overreaching by Ruskey or McBee as to the regulation's application. Rather, the determination turned upon the technical wording and interpretation of the regulatory

-18-

guidance—Kilgore was traveling on an interstate highway, but the transportation was not interstate in nature. Based on these facts, the Court finds that while the violations alleged by Defendants might not have led to a meritorious decision on appeal, this does not render their actions retaliatory. Rather, the record reflects that Defendants' actions were based on bona fide complaints alleged by Gearhart and their reasonable interpretation of the law. As a final matter, the Court also notes that neither Defendant Ruskey or McBee were named Defendants in *Adair v. Hunter*, nor does the record reflect that they were in any way involved in that lawsuit.

A plaintiff may offer circumstantial evidence in support of the causation element, but such evidence must still be sufficient to support a finding that the adverse action took place "but for" the protected conduct. *Thaddeus-X*, 175 F.3d at 399 (holding that "[c]ircumstantial evidence, like the timing of events" may be offered to prove retaliatory motive). The Court finds that Plaintiffs' successful appeal of the MWS's suspension fails to constitute sufficient circumstantial evidence for the reasons set forth above. The only other circumstantial evidence offered by Plaintiffs is the timing of the relevant events. Temporal proximity, by itself, is rarely sufficient to establish causation. *Vereecke*, 609 F.3d at 401. In this case, the alleged adverse action took place more than seven months after Plaintiffs filed suit in *Adair v. Hunter*. The Sixth Circuit has found considerably shorter time-periods insufficient to establish causation. *See, e.g., Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (finding four-month gap between protected conduct and adverse action failed to evidence causation *per se*). Thus, temporal proximity adds little support to Plaintiffs' claims.

In sum, the Court finds Plaintiffs have failed to adduce sufficient evidence that their protected conduct was the "but for" cause of MWS's suspension from the THP

rotation list. Accordingly, summary judgment will be **GRANTED** on this claim, and it will be **DISMISSED**.

c. *General Harassment*

In the Complaint, Plaintiff Rodney Kilgore alleges Defendant Hunter or agents of Defendant Hunter harassed him "on a regular basis" after he filed suit in *Adair v. Hunter,* which forced him to close the MWS location in Grundy County, Tennessee. The Complaint does not specify what kind of harassment Rodney Kilgore suffered or in what way it financially affected his businesses. (Doc. 1 at 8-9).

As outlined above, Plaintiff must establish that he suffered an adverse action "that would deter a person of ordinary firmness from continuing to engage in that conduct." *Thaddeus-X*, 175 F.3d at 394. Defendants argue that Plaintiffs cannot satisfy the "adverse action" requirement. Before the Court may engage in this analysis, it must determine which adverse actions Rodney Kilgore has properly alleged and supported with competent evidence before determining whether such actions sufficiently establish this element.

The "competent" summary judgment evidence offered by Rodney Kilgore in support of this particular claim is shrouded in confusion and discrepancy. In his sworn deposition, Rodney Kilgore denied having any contact with Defendant Hunter himself after *Adair v. Hunter* was filed. Specifically, he testified as follows:

> Q: [F]rom the time you filed your appeal and lost, what interaction did you have with Johnny Hunter thereafter? Let me help you. Is the answer none?
>
> A: I think I had none.
>
> Q. None. You would know, wouldn't you?
>
> A: Yeah. Yes sir.

-20-

. . . .

Q:      And you told us that after June 11 [2013] you had no more
        communication or real contact with Johnny Hunter . . . . [A]fter June
        11, 2013 you never had any more communication with him. True?

A.      I think so. True.

(Doc. 110-7 at 2, 3).

Rodney Kilgore did testify that he had limited interaction with Kevin Keele—a private investigator that works for Defendant Hunter's attorney—after filing the first suit. Although Rodney Kilgore initially testified that Keele "followed" him countless times, when pressed to quantify their interactions Rodney Kilgore estimated that he saw Keele five to eight times, although he could not be certain. (*Id.* at 7-8). Later, Rodney Kilgore characterized the contact as "running into" Keele at his business or while towing vehicles. He further testified that Keele interfered with his business, but Rodney Kilgore could not elaborate on Keele's behavior or explain how or to what extent his business was damaged. (*Id.*). At one point, Rodney Kilgore offered a vague and somewhat confusing hypothetical answer indicating that he saw Keele at his home: "Well, every time you go home tonight, if you had a black car sitting there, or whatever you got driving, and they think – everybody thinks it's the police, are they going to show up at your house?" (*Id.*). There is no indication in the deposition testimony that Keele threatened Rodney Kilgore or engaged in threatening conduct. Overall, Rodney Kilgore's answers in his deposition in this regard were evasive, conclusory, and amorphous.

Upon being confronted with Defendants' Motion for Summary Judgment pointing out the defects in his ability to prove this claim, Rodney Kilgore submitted a "Supplemental Sworn Affidavit," in which he considerably changed his story. For

purposes of clarity, and so the record may fully demonstrate the stark differences between his deposition testimony and his later affidavit, the Court will fully recount Kiglore's averments:

> Shortly after [the Grundy County] location opened until I closed it in or around March 2016, I was harassed by Lt. Johnny Hunter, and his attorney's private investigator Kevin Keele. As the date indicates, I opened the location after filing two federal lawsuits against Lt. Hunter and others. Mr. Keele works for Mr. Hunter's Attorney Ray Fraley and has attended depositions and served subpoenas in the lawsuits that I have filed. As I stated previously, I was harassed on a regular basis by both Lt. Hunter and Mr. Keele. I was followed by either Lt. Hunter or Mr. Keele on a regular basis whether I was operating a truck or in my person[al] vehicle. Either or both gentleman followed me on calls or my drivers on calls and parked near the scene while work was being done. When I or one of my drivers left, Lt. Hunter and/or Mr. Keele left and followed me or my driver back to the company or wherever the vehicle was to be towed. Lt. Hunter and/or Mr. Keele routinely parked their vehicle at the business location of Monteagle Wrecker Service of Grundy and took pictures. These gentlemen also routinely parked their vehicles outside my personal residence and took pictures of me while I was inside. I also saw both gentlemen at other business[es] that either I own or are owned by other individuals. The following and taking pictures happened so many times that I lost count. On one occasion, I attempted to take a picture of Mr. Keele and follow him and ask him why he was following and taking pictures of me to no avail.

> I honestly feared for my life as the repetitive conduct was clearly intimidating and the substantial majority of the contacts with Lt. Hunter and Mr. Keele occurred at night making me feel extremely vulnerable as to what if anything they intended to do.

> The harassment by Lt. Hunter and Mr. Keele occurred on a regular if not daily basis. It seemed to begin when I opened the location at Monteagle Wrecker Service of Grundy County, Tennessee. As a result, I felt I had no choice but to close the location. I did so on March 2016 . . . . The harassment stopped when I closed the location.

(Doc. 132-4 at 8-10).

Thus, within the time between his deposition and the creation of the affidavit, Kilgore's interaction with Defendant Hunter grew from non-existent to daily and pervasive. Kilgore's interaction with Keele also underwent an astounding transformation.

Keele went from a handful of "run ins" with Kilgore at various locations to stalking him nightly at his home and taking photographs of Kilgore inside his home. The averments contained in Rodney Kilgore's affidavit are significant embellishments, and in most cases outright contradictions, to his deposition testimony.

It is well-established within the Sixth Circuit that a party cannot create a material issue of fact by filing an affidavit which contradicts his earlier deposition testimony. *See, e.g., Lanier v. Bryant,* 332 F.3d 999, 1004 (6th Cir.2003); *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1352 (6th Cir.1991); *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986). The Sixth Circuit has explained the importance of this rule:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984) (quoting *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).

In deciding the admissibility of a post-deposition affidavit at the summary judgment stage, a district court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L. v. PCC Airfolis, LLC*, 448 F.3d 899, 908 (6th Cir. 2006). If so, the affidavit must be stricken "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.* If there is no direct contradiction, the district court "should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). In *Aerel*, the Sixth Circuit adopted three non-exhaustive factors, originally set forth by the Tenth Circuit in *Franks*, for courts to consider in determining

-23-

whether the nonmoving party has attempted to use the affidavit to create a sham fact issue:

> [W]hether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain.

*Id.* at 909 (quoting *Franks*, 796 F.2d at 1237) (alteration in original).

Several of Rodney Kilgore's statements in his affidavit are direct contradictions of his earlier deposition testimony. These include any statement as to Defendant Hunter's retaliatory conduct. As outlined above, Kilgore expressly disavowed any interaction or contact with Defendant Hunter following the filing of *Adair v. Hunter* during his deposition. (Doc. 110-7 at 2, 3). He may not create a material dispute of fact by submitting an affidavit contrary to that testimony.

Likewise, Rodney Kilgore's deposition testimony as to the frequency with which he encountered Kevin Keele cannot be altered by the supplemental affidavit. During the deposition, Defendants inquired no fewer than nine times as to how many times Rodney Kilgore encountered Keele, and his most definitive answer was between five to eight times. (Doc. 110-7 at 7-8). In the affidavit, Kilgore avers that he saw Keele daily and indicates that it occurred over an extended period of time. The Court finds that these statements are also direct contradictions.

Rodney Kilgore might argue that he lacked memory or certainty as to the number of his interactions with Keele during his deposition. For example, even after testifying that his best guess of the number of times he saw Keele was between five to eight, Rodney Kilgore repeated that he could not be "certain." (*Id.*). In his sworn affidavit, however, Kilgore recalled with remarkable clarity that he saw Keele nearly every day in the months

between when he opened his business in Grundy County and the date that he decided to close. The Court notes that when a witness claims a loss of memory during his deposition, but later describes significant details in his affidavit, courts often strike the affidavit as conflicting testimony. *See Reid,* 790 F.2d at 459–60 (striking plaintiff's affidavit statement that the employer representative told her the "main reasons" the employer discharged its employees were falsification of time cards, excessive tardiness or absences, and theft, because, in her deposition, plaintiff only remembered the employer representative telling her that she could be fired for punching someone else's time card); *Smith v.. Consol. Rail Corp.,* No. 95–3727, 1996 WL 366283, at *1 (6th Cir. June 28, 1996) (finding a contradiction when plaintiff testified in his deposition that he did not know why he tripped, but then later stated in his affidavit that "the site of his accident was filled with debris, vegetation, and loose pieces of ballast, and that ... one of those items caused [his] injuries").

Rodney Kilgore offers no justification, much less a persuasive one, explaining the contradictions between his deposition testimony and his sworn affidavit. *Aerel,* 448 F.3d at 908 (holding that a contradictory the affidavit must be stricken "unless the party opposing summary judgment provides a persuasive justification for the contradiction."). Accordingly, the Court finds that these contradictory statements cannot be considered as competent evidence for purposes of summary judgment.

Some of the statements in Kilgore's affidavit, however, are more ambiguous as to whether they are "directly contradictory." These statements include the harassing nature of Keele's behavior. The Court notes that Rodney Kilgore was prompted at length to describe Keele's conduct at his deposition. (Doc. 110-7 at 7-10). Specifically, Defendants asked Kilgore three times to describe Keele's conduct and how it interfered with his

business, but his most definitive response was that Keele "just interfered." (*Id.*). Despite this extensive questioning, Rodney Kilgore failed to offer information that Kilgore took pictures of him at his home on a regular basis, or that the majority of their interactions took place at night. This is precisely the type of information Defendants were attempting to elecit during Kilgore's deposition, and yet, he failed to provide it, choosing instead to submit a sworn affidavit, after the fact, that is no longer subject to challenge by cross-examination. The only hint of this conduct Kilgore provided was a confusing hypothetical answer, "Well, every time you go to [sic] home tonight, if you had a black car sitting there, or whatever you got driving, and they think – everybody around thinks it's the police, are they going to show up at your house?" (*Id.*).

The Court is mindful that parties are not required to volunteer information during a deposition. Thus, any omission of information that results from opposing counsel's failure to ask a pertinent question cannot be ascribed to the party deposed, and he may provide supplementary information in a post-deposition affidavit. *See Briggs v. Potter,* 463 F.3d 507, 513 (6th Cir.2006) (findings that "[w]hile Briggs was questioned generally about that June 2001 conversation, he was not expressly asked what Pickard had said to him during that conversation. As Briggs was under no obligation to volunteer everything Pickard said during that conversation, he should not be prevented from providing greater detail in a later affidavit."). In most every respect, this is not what is presently before the Court in the instant case. Opposing counsel pressed Rodney Kilgore to describe Keele's conduct, and he refused to give a clear answer.

The only possible exception is Kilgore's "hypothetical answer" in which he indicated that Keele parked outside his home on a few occasions at night. In resolving defendant's objections to the affidavits offered in opposition to summary judgment, the

Court must use "a scalpel, not a butcher knife, ... striking portions of affidavits that do not satisfy the requirements of [Rule 56(c) (4) ]." *Upshaw v. Ford Motor Co.,* 576 F.3d 576, 593 (6th Cir.2009) (citation and internal quotation marks omitted) (holding district court abused its discretion by striking the entire affidavit, rather than striking only the inadmissible portions). In an abundance of caution, the Court will not strike those portions of Rodney Kilgore's affidavit that state Keele visited Kilgore's home, and that some of their interactions took place at night. Although Kilgore's answer was confusing, opposing counsel had the opportunity to inquire further, but failed to do so. The Court will not allow Kilgore's statements that Keele took pictures of him inside his home, as there is no indication, vague or otherwise, of that information provided in his deposition. Moreover, Kilgore does not argue that his affidavit was based on new evidence, evidence that was not available at the time of his deposition, or to resolve confusions. *Aerel*, 448 F.3d at 909.

Accordingly, the Court will consider the following evidence in support of Rodney Kilgore's allegation of an adverse action: (1) that Defendant Hunter's private investigator observed or followed Kilgore between five to eight times after Kilgore filed suit; (2) that at least some of these interactions took place at night; and (3) that at least some of these interactions took place at Kilgore's home.

Having determined the alleged "adverse actions" of record, the Court must determine whether Rodney Kilgore's interactions with Kevin Keele would "deter a person of ordinary firmness from engaging in the protected conduct." This is a "static" inquiry, meaning the Court must consider the context of the alleged retaliatory action. *Id.* at 398. "Trivial actions" that are of "de minimis" significance will not constitute an adverse action. *Id.* Moreover, whether Plaintiff was actually chilled from engaging in protected activity is

irrelevant—the pertinent inquiry is whether a person of ordinary firmness would be deterred. *Harris v. Bornhorst*, 513 F.3d 503, 519 (6th Cir. 2008) (citation omitted). Examples of sufficiently severe adverse actions include: (1) physical threats, *Thaddeus-X*, 175 F.3d at 398; (2) obstruction of an entity from continuing its business practices, *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010); and (3) a defendant's refusal to grant a permit necessary for plaintiff to conduct her business. *Fritz v. Charter Tp. of Comstock*, 592 F.3d 718, 728-29 (6th Cir. 2010).

The Court finds that Keele's actions, as alleged by Rodney Kilgore, fail to constitute an adverse action. There are no allegations that Keele threatened Kilgore, obstructed Kilgore's ability to engage in his ordinary business practices, or refused to give Kilgore something he required to conduct business. The most that can be gleaned from Kilgore's allegations is that, following a lawsuit filed against Defendant Hunter, Hunter's attorneys and their employees investigated the claims enumerated in Kilgore's lawsuit by observing him and his business on a handful of occasions. This is not an adverse action. Rather, a defendant's investigation of a plaintiff's claims is the logical and expected result of filing suit. A person of ordinary firmness would reasonably foresee this consequence and remain undeterred from pursuing the underlying action.

The Court is aware of the general rule that retaliatory harassment need not be extreme to satisfy the adverse action requirement, and that the issue usually creates a fact question. *Holzemer*, 621 F.3d at 524. On the other hand, the Sixth Circuit has also held that this element is meant to "weed out inconsequential actions." *Thaddeus-X*, 175 F.3d at 398. The ultimate inquiry is whether "a reasonable trier of fact could conclude that a retaliatory act would deter a person from exercising his rights[.]" *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005) (citations omitted). Given Rodney Kilgore's meager

-28-

allegations, the Court finds that no reasonable trier of act could conclude the Keele's actions would deter an individual from exercising his rights.

Accordingly, for these reasons, the Court finds that Defendants are entitled to judgment as a matter of law as to this claim, and it will be **DISMISSED**.

2. Access to the Courts

Plaintiffs also allege that Defendants' wrongful conduct denied them their constitutional right to access the courts. The United States Supreme Court has recognized a constitutional right of access to the courts, in which a plaintiff with a non-frivolous legal cause of action has the right to bring that cause of action before the court. *See, e.g., Christopher v. Harbury*, 536 U.S. 403, 415 n. 12 (2002) (collecting cases). As explained by the Sixth Circuit in *Flagg v. City of Detroit*:

> Denial of access to the courts claims may be forward-looking or backward-looking. In forward-looking claims, the plaintiff accuses the government of creating or maintaining some frustrating condition that stands between the plaintiff and the courthouse door. The object of the suit is to eliminate the condition, thereby allowing the plaintiff, usually an inmate, to sue on some underlying legal claim. In backward-looking claims . . . the government is accused of barring the courthouse door by concealing or destroying evidence so that the plaintiff is unable to ever obtain an adequate remedy on the underlying claim.

715 F.3d 165, 173 (6th Cir. 2013) (internal citations and quotations omitted). In this case, Plaintiffs do not bring a "forward-looking" claim, as there is no accusation that Defendants have "stood between" them and the ability to file their claim. In fact, as outlined above, Plaintiffs had already filed suit at the time the alleged wrongful conduct took place. Thus, Plaintiffs must establish a "backward-looking" claim.

In *Flagg*, the Sixth Circuit outlined the requirements for demonstrating a backward-looking denial of access claim:

> (1) a non-frivolous underlying claim (2) obstructive actions by state actors, (3) substantial prejudice to the underlying claim that cannot be remedied

-29-

> by the state court, and (4) a request for relief which the plaintiff would have sought on the underlying claim and is now otherwise unattainable[.]

*Id.* at 174 (internal citations and quotations omitted). The Court finds that Plaintiffs have failed to demonstrate the third and fourth elements of this claim. They do not allege, much less provide competent evidence in support, a substantial prejudice stemming from Defendants' conduct. Said another way, there is no indication that the underlying claims filed in *Adair v. Hunter* suffered as a result of events that took place after the lawsuit was filed. Moreover, Plaintiffs do not identify relief they would sought and attained on the underlying claim that is no longer available. For these reasons, summary judgment will be **GRANTED** as to this claim.[8]

### B.      Plaintiffs' Motion to Compel Mediation (Doc. 94)

In this Motion, Plaintiffs request Court-ordered mediation. They contend that mediation would minimize effort and expense in litigating this action.

Plaintiffs filed an identical motion *Adair v. Hunter*. The Court denied that previous motion, and will do so again in this case for the same reasons. First, while the Court always encourages mediation and other settlement efforts between parties, there is no justification for ordering the parties to engage in mediation at the eleventh hour of this case, after summary judgment motions have been filed and briefed. In addition, the parties have had ample opportunity over the past three years to explore a non-judicial resolution to their dispute. Finally, given that the Court has found Plaintiffs' claims to be without merit, as outlined above, mediation would save little time, effort, or expense at

---

[8] Because the Court has found that no constitutional violation occurred, it is unnecessary to analyze Defendants' arguments regarding qualified immunity.

this stage in the case. Accordingly, the Motion to Compel Mediation (Doc. 194) will be **DENIED**.

### C. Plaintiffs' Motion for Summary Judgment/Motion in Limine (Doc. 107)

In this Motion, Plaintiff Rodney Kilgore repeats his collateral estoppel argument and insists that it entitles him to either summary judgment on his First Amendment retaliation claim or exclusion of any evidence concerning the THP hearing if this matter proceeds to trial.

As an initial matter, the Court finds that the format of this motion is improper. Plaintiffs state the motion is either a "[motion] in limine and/or [filed] pursuant to Fed. R. Civ. Pro 56, whichever the court deems the appropriate designation for the Motion." (Doc. 107 at 1). The Court is not in the position to guess as to what type of relief Plaintiffs seek, or the legal basis upon which that claim for relief rests. Pursuant to Local Rule 7/1(b), motions and supporting briefs "shall include a concise statement of the factual and legal grounds which justify the ruling sought from the Court." E.D. Tenn. L.R. 7.1(b). The instant Motion fails to fulfill these requirements.

In any event, the Motion is without merit. Although Rodney Kilgore indicates that he is entitled to judgment as a matter of law, he also explicitly states that "he does not argue that Captain Christian's overruling the letter of determination warrant[s] the imposition of § 1983 liability[.]" Indeed, while Rodney Kilgore's successful appeal is relevant evidence, it is not dispositive of the issue by any means, for the reasons set forth in the Court's analysis *supra*. The same is true to the extent the Motion may be construed as seeking the exclusion of evidence, and in addition, such a motion is moot in light of the Court's finding that Defendants' Motion for Summary Judgment should be granted.

Accordingly, for these reasons, Plaintiffs' Motion (Doc. 107) will be **DENIED**.

**D.     Plaintiffs' Motion to Dismiss Without Prejudice (Doc. 159)**

In this Motion, Plaintiffs request that the instant action be dismissed without prejudice. Plaintiffs provide no justification beyond the conclusory contention that the dismissal will not prejudice Defendant and is in the interest of judicial economy. Given the late stage of this proceeding, the Court finds that judicial economy would be best served by resolving this case on its merits. In addition, the Court finds that Defendants would suffer considerable prejudice if, after extensive litigation and motion practice, Plaintiffs were allowed to push the "re-set button" and file suit once again. Accordingly, the Motion to Dismiss Without Prejudice (Doc. 159) will be **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds and orders as follows:

1.      Plaintiffs' Motion to Compel Mediation (Doc. 94), Motion for Partial Summary Judgment/Motion in Limine (Doc. 107), and Motion to Dismiss Without Prejudice (Doc. 158) are **DENIED**;

2.      Defendants' Motion for Summary Judgment (Doc. 110) is **GRANTED**, and Plaintiffs' claims are **DISMISSED** with prejudice;

3.      All other pending motions are **DENIED** as moot; and

4.      A separate judgment shall enter.


**SO ORDERED** this 28th day of June, 2018.


        _/s/ Harry S. Mattice, Jr._____
        HARRY S. MATTICE, JR.
        UNITED STATES DISTRICT JUDGE